Slip Op. 15-26

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| KIROVO-CHEPETSKY KHIMICHESKY KOMBINAT, JSC, part of URALCHEM, OJSC, | : : : : | |
| Plaintiff, | : : | Before:  Gregory W. Carman, Senior Judge |
| v. | : : | Court No. 13-00324 |
| UNITED STATES, | : : | |
| Defendant, | : : | |
| and | : : | |
| CF INDUSTRIES, INC. and EL DORADO CHEMICAL COMPANY, | : : : | |
| Defendant-Intervenors. | : : | |

## OPINION AND ORDER

[Affirming Commerce's final scope ruling that Plaintiff's NS 30:7 imports are covered by the antidumping duty order on solid fertilizer grade ammonium nitrate from Russia.]

*John M. Gurley*, *Diana Dimitriuc-Quaia*, and *Tina Termei*, Arent Fox LLP, of Washington, DC, for Plaintiff.

*Veronica M. Onyema*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *David P. Lyons*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Valerie A. Slater* and *Margaret C. Marsh*, Akin Gump Strauss Hauer & Feld LLP, of Washington, DC, for Defendant-Intervenors.

Carman, Senior Judge: Before the Court is the motion of Plaintiff Kirovo-Chepetsky

Khimichesky Kombinat, JSC, part of Uralchem, OJSC ("Uralchem") for judgment on the agency

record pursuant to USCIT Rule 56.2. Mem. of Law in Supp. of Pl.'s Rule 56.2 Mot. for J. upon

the Agency R. ("*Mot.*"), ECF No. 25. Uralchem challenges a ruling by the Department of

Commerce ("the Department" or "Commerce") that Uralchem's solid fertilizer product known as

NS 30:7 is covered by the scope of an antidumping duty order on solid fertilizer grade

ammonium nitrate products from the Russian Federation. *See id.* at 1 (citing Mem. from E.

Eastwood, to G. Taverman, re: Final Scope Ruling—NS 30:7 Solid Fertilizer Grade Ammonium

Nitrate from the Russian Federation (Russia) (A-821-811) (Aug. 6, 2013), ECF No. 27 Tab 19,

P.R.[1] 66 ("*Final Scope Ruling*"). Defendant United States ( "the government") opposes the

motion. *See* Def.'s Resp. to Pl.'s Rule 56.2 Mot. for J. upon the Agency R. ("*Opp.*"), ECF No.

30. Defendant-Intervenors CF Industries, Inc. and El Dorado Chemical Company (collectively

"CF Industries") also oppose the motion. *See* Def.-Intervenor's Resp. in Opp'n to Pl.'s Rule 56.2

Mot. for J. on the Agency R. ("*CF Industries Opp.*"), ECF No. 31.

For the reasons that follow, the Court affirms Commerce's decision that Plaintiff's NS

30:7 product is within the scope of the antidumping duty order on solid fertilizer grade Russian

ammonium nitrate products. Judgment will issue accordingly.

### BACKGROUND

On April 27, 2011, Commerce issued an antidumping duty order on solid fertilizer grade

ammonium nitrate products from the Russian Federation. *See Termination of Suspension*

*Agreement on Solid Fertilizer Grade Ammonium Nitrate From the Russian Federation and*

---

[1] "P.R." refers to the public administrative record of this proceeding.

*Notice of Antidumping Duty Order*, 76 Fed. Reg. 23,569 (Dep't Commerce Apr. 27, 2011)

("*ADD Order*").

On September 21, 2012, Uralchem requested that the Department issue a scope ruling

"that Uralchem's ammonium sulfate nitrate identified as NS 30:7 . . . is not within the scope of"

the *ADD Order*. Uralchem's Request for a Scope Ruling at 1 ("Scope Ruling Request"), ECF

No. 19, P.R. 1; *see also* Public App. to Pl.'s Mem. in Supp. of Rule 56.2 Mot. for Summary J. on

the Agency R., Tab 1, ECF No. 27, App. of Docs. Supp. Def.'s Resp. to Pl.'s Rule 56.2 Mot. for

J. upon the Agency R., Tab 1, ECF No. 32-1. Uralchem described NS 30:7 as "an ammonium

sulfate nitrate, a solid fertilizer designed to provide a balanced ratio of nitrogen and sulfur

nutrients to sulfur-deficient areas and sulfur-sensitive crops." Scope Ruling Request at 2.

According to chemical testing results submitted by Uralchem, NS 30:7 is a granular white or

grey-yellow dry solid consisting predominantly of "a pair of double salts of ammonium nitrate

and ammonium sulfate" that account for 59.1% of the product by weight. *Id.* at 4; *see also id.*,

Ex. 1. The next major component of NS 30:7 is "uncombined ammonium nitrate," comprising

32.2% of the product by weight. *Id.* Finally, NS 30:7 is rounded out by 8.7% of uncombined

ammonium sulfate and less than one percent each of additives, trace elements, and water. *Id.*

Uralchem noted in its Scope Ruling Request that NS 30:7 differs from other ammonium

nitrate fertilizers "because its nitrogen content is derived from both ammonium nitrate and

ammonium sulfate." *Id.* at 2. Uralchem distinguished NS 30:7 on the grounds that its total

nitrogen content "attributable to ammonium nitrate (both as double salts and in uncombined

form) is only about 23%, which is a significantly smaller percentage of nitrogen than any known

ammonium nitrate product on the U.S. market (the nitrogen content of 'pure' ammonium nitrate

is 35%)." *Id.* Uralchem also pointed out that NS 30:7 contains "60% more ammonia nitrogen

than nitrate nitrogen," dissimilar from "subject merchandise under" the *ADD Order. Id.* at 2-3.

Instead, Uralchem claimed, NS 30:7 is "designed to provide a balanced ration of two nutrients

required for amino acid and protein synthesis in crops—sulfur and nitrogen—in a product that

acts in a slower manner than the typical ammonium nitrate product." *Id.* at 3. In sum, according

to Uralchem, "differences in crystal structure, chemical composition and uses show that NS 30:7

is not ammonium nitrate covered by the scope" of the *ADD Order. Id.* Uralchem argued in the

alternative that even if a plain reading of the scope did not exclude NS 30:7 due to lack of clarity,

NS 30:7 should be excluded under the so-called *Diversified Products* criteria in 19 C.F.R.

§ 351.225(k). *See id.* at 3-4.

Commerce initiated a scope inquiry to determine whether NS 30:7 fell within the scope

of the *ADD Order* and, after accepting submissions from the interested parties, found NS 30:7 to

be within scope. *See generally Final Scope Ruling.* Plaintiff thereafter filed this suit to appeal the

*Final Scope Ruling.* By its Rule 56.2 motion, Uralchem argues that the *Final Scope Ruling* is

unsupported by substantial evidence, based upon a misapplication of legal standards governing

scope determinations, flawed due to the illegal rejection of certain factual evidence, and arbitrary

and capricious in that it ignored relevant evidence and arguments. *Mot.* at 1-3.

## JURISDICTION & STANDARD OF REVIEW

The Court of International Trade exercises jurisdiction over scope determinations

pursuant to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c). In such

proceedings, the court "shall hold unlawful any determination, finding, or conclusion found . . .

to be unsupported by substantial evidence on the record, or otherwise not in accordance with

law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also NSK Ltd. v. United States,* 481 F.3d 1355, 1359

(Fed. Cir. 2007) (internal quotations and citations omitted). Substantial evidence is "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Crawfish Processors Alliance v. United States*, 483 F.3d 1358, 1361 (Fed. Cir. 2007) (internal

citations omitted). Substantial evidence may be "less than the weight of the evidence," and a

decision may still be supported by substantial evidence even where there is "the possibility of

drawing two inconsistent conclusions from evidence." *Consolo v. Fed. Maritime Comm'n*, 383

U.S. 607, 620 (1966). However, the Court must also ensure that the agency's decision is

reasonable in the face of the record as a whole, including evidence which detracts from the

agency's conclusion. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir.

2006).

      The legal framework by which Commerce conducts scope determinations stems from the

agency's regulations, which provide that "[a]ny interested party may apply for a ruling as to

whether a particular product is within the scope of an order." 19 C.F.R. § 351.225(c). Rulings on

scope ruling requests are governed by a three-step analysis. First, Commerce examines the scope

language contained in the at-issue order to see if it is ambiguous and open to interpretation. *Mid*

*Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (internal citations

omitted). Where Commerce finds the order's scope language not to be ambiguous, Commerce

"states what it understands to be the plain meaning of the language" and may terminate the scope

proceeding without further action. *ArcelorMittal Stainless Belgium N.V. v. United States*, 694

F.3d 82, 84 (Fed. Cir. 2012). When Commerce finds that the scope language is ambiguous, it

turns to the second step of its analysis. *See* 19 C.F.R. § 351.225(k)(1)-(2) and *Mid Continent*

*Nail*, 725 F.3d at 1302. At the second step, Commerce seeks to interpret the ambiguity in the

scope by reference to "[t]he descriptions of the merchandise contained in the petition, the initial

investigation, and the determinations of [Commerce] and the [International Trade] Commission."

19 C.F.R. § 351.225(k)(1) (commonly called "(k)(1) materials" or "(k)(1) factors" in reference to

this regulatory subsection.) Commerce will end the inquiry if it is able to interpret the scope at

this second step. Only if the second step cannot resolve the ambiguity may Commerce move on

to the third step of its analysis, at which it takes into consideration the following factors: "[t]he

physical characteristics of the product," "[t]he expectations of the ultimate purchasers," "[t]he

ultimate use of the product," "[t]he channels of trade in which the product is sold," and "[t]he

manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2) (commonly

called "(k)(2) materials" or "(k)(2) factors"); *see Mid Continent Nail*, 725 F.3d at 1302.

In reviewing scope determinations, the Court must give Commerce "substantial deference

with regard to its interpretation of its own antidumping duty orders," which are "particularly

within the expertise and special competence of Commerce." *King Supply Co., LLC v. United

States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (citations and quotations omitted); *accord Duferco

Steel, Inc. v. United States*, 296 F.3d 1087, 1094-95 (Fed. Cir. 2002). Despite this deference, the

Court must ensure that Commerce does not "interpret an antidumping order so as to change the

scope of that order" nor "interpret an order in a manner contrary to its terms." *Eckstrom Indus.,

Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (quotations and citations omitted).

This is because the language of the scope in the antidumping duty order is the ultimate

touchstone of a scope ruling. Thus "Commerce may not place merchandise within the scope of

an order if the scope language may not reasonably be interpreted to include that merchandise."

*Peer Bearing Co.-Changshan v. United States*, 38 CIT ___, ___, 986 F. Supp. 2d 1389, 1397

(2014). A similar principle of deference applies when the Court reviews Commerce's

interpretation of its own regulations: the Court will uphold the interpretation at issue unless it is

plainly erroneous or inconsistent with the language of the regulation. *See Torrington Co. v.*

*United States*, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998) (citations omitted).

DISCUSSION

Plaintiff attacks the *Final Scope Ruling* on several grounds, each discussed in turn below.

I.   **Ambiguity in the Scope Language**

A.      **Contentions of the Parties**

The parties agree that the first step in Commerce's scope ruling process must be

consideration of whether the scope language in the *ADD Order* unambiguously covers NS 30:7.

*See Mot.* at 10; *Opp.* at 10; *CF Industries Opp.* at 15-16. However, they differ on the conclusion

Commerce should have reached.

The scope of the *ADD Order* states:

> The products covered by the order include solid, fertilizer grade ammonium
> nitrate products, whether prilled, granular or in other solid form, with or without
> additives or coating, and with a bulk density equal to or greater than 53 pounds
> per cubic foot. Specifically excluded from this scope is solid ammonium nitrate
> with a bulk density less than 53 pounds per cubic foot (commonly referred to as
> industrial or explosive grade ammonium nitrate). The merchandise subject to this
> order is classified in the Harmonized Tariff Schedule of the United States
> ("HTSUS") at subheading 3102.30.00.00. Although the HTSUS subheadings are
> provided for convenience and customs purposes, the written description of the
> merchandise within the scope is dispositive.

*ADD Order*, 76 Fed. Reg. at 23,569-70.

Plaintiff claims that "the determinative language is 'ammonium nitrate products,' and

therefore, the subject NS 30:7 only falls within the scope of the *Order* if it is determined to be an

'ammonium nitrate product[].'" *Mot.* at 11 (quoting *ADD Order*, 76 Fed. Reg at 23,569).

Plaintiff argues that "[t]he only question relevant to the first step is whether NS 30:7 is AN." *Id.*

Stating that "NS 30:7 contains some ammonium nitrate as a minority component, but it is simply

not an AN product," Uralchem contends that NS 30:7 "is predominantly a double salt product of

ammonium nitrate and ammonium sulfate—and not an AN product." *Id.* at 11-12. Uralchem

claims that Commerce reached its incorrect conclusion because it failed to take the record

evidence into account as it "made no serious attempt to understand" the product or review the

scientific evidence in the record, instead relying only on CF Industries' interpretation of the *ADD*

*Order*. *Id.* at 11. Uralchem also argues that Commerce erred in reasoning that NS 30:7 might be

included in the scope on the grounds that no minimum ammonium nitrate content is specified by

the scope language. *See id.* at 12. Uralchem argues that Commerce may not include merchandise

in the scope of an order simply due to the absence of a particular exclusion. *Id.*

Commerce notes that the law requires only that Commerce find "language in the order

that is subject to interpretation" before moving to step two of its scope analysis by examining the

record of the antidumping investigation. *Opp.* at 12 (citing *Duferco*, 296 F.3d at 1089); *see also*

*CF Industries Opp.* 16.[2] The Court has said there is "a low threshold" to justify this finding. *Id.*

(citing *Laminated Woven Sacks Comm. v. United States*, 34 CIT ___, ___, 716 F. Supp. 2d 1316,

1325 (2010) (internal citations omitted). Commerce points out that it found that the "ammonium

nitrate products" referred to in the scope were not necessarily "merely pure ammonium nitrate,"

leaving it ambiguous what amount of ammonium nitrate content would qualify a product as an

ammonium nitrate product. *Id.* at 13 (citing *Final Scope Ruling* at 3-4); *see also CF Industries*

*Opp.* at 18. Arguing that "Uralchem merely assumes—without support rooted in the language of

the order—the answer to the fundamental question of what constitutes an 'ammonium nitrate

product,'" Commerce calls Uralchem's contention "circular and unpersuasive." *Id; see also CF*

---

[2] In general, and except as otherwise specified, the Court has examined Defendant-Intervenors brief and found it to raise arguments and authorities materially similar to those raised by the government.

*Industries Opp.* at 17. Commerce asserts that in step one of the scope inquiry it merely "could not exclude or include NS 30:7 solely on the basis of this ambiguous scope language." *Id.*

### B.     Commerce Reasonably Found the Scope Language Ambiguous

The Court upholds Commerce's step-one finding that the scope language was ambiguous and justified moving on to the second step and examining the (k)(1) factors. Commerce is correct that the bar to justify a finding of ambiguity in the scope language is a low barrier. *See Novosteel SA v. United States*, 284 F.3d 1261, 1272 (Fed. Cir. 2002). The inquiry boils down to whether the phrase "ammonium nitrate products" in the scope of the order can only mean pure ammonium nitrate, and, if not, how much ammonium nitrate a product must contain to constitute an ammonium nitrate "product." Commerce reasonably took these to be real questions and concluded that the plain language of the antidumping duty order's scope did not make the answers a foregone conclusion. The Court therefore concludes that Commerce acted reasonably in finding the scope language ambiguous and seeking to interpret it with (k)(1) materials.

## II.     Consideration of the (k)(1) Factors

Following its first-step determination, Commerce moved to step two: examining the petition and the record of the antidumping investigation, pursuant to 19 C.F.R. § 351.225(k), in order to apply the scope language. *See id.* at 1270.

### A.     Contentions of the Parties

Uralchem claims that Commerce erred in its step two determination in a number of ways. First, Uralchem contends that Commerce's finding that NS 30:7 is an ammonium nitrate product was unsupported by the record evidence, which in Uralchem's view demonstrates conclusively that NS 30:7 is chemically distinct from ammonium nitrate. *See Mot.* at 13-22. Second, Uralchem claims that Commerce applied a new and incorrect legal standard in the scope

determination, examining the condition of NS 30:7 after application by end users rather than the

condition of the product at importation. *See id.* at 22-25. Third, Uralchem contends that

Commerce improperly rejected certain material Uralchem attempted to submit with its comments

on the preliminary scope ruling on the grounds that they constituted untimely filed factual

information. *See id.* at 25-28. Finally, Uralchem argues that Commerce's *Final Scope Ruling* is

arbitrary and capricious, and therefore not in accordance with law, due to the flaws previously

described. *See id.* at 28-30.

        1.      <u>The Chemistry of NS 30:7</u>

      Addressing the record evidence about the chemical nature of NS 30:7, Uralchem accuses

Commerce of having "completely misunderstood the subject product" and "blindly ignoring the

overwhelming evidence" to rely solely on "the opinion of one of [Petitioner]'s employees in the

face of the vast amount of evidence that disproves his position." *Id.* at 14. The specific

Commerce finding that Uralchem focuses on is this:  "NS 30:7 is 70 percent AN when both the

combined and uncombined AN content are taken into account. While there may be a point at

which a product containing AN is no longer considered in-scope merchandise . . . we disagree

that a product comprised predominantly of AN falls below that threshold such that it is excluded

from the scope." *Final Scope Ruling* at 4.

      Uralchem points to independent laboratory testing in the record that "NS 30:7 is an

ammonium sulfate nitrate (ASN) solid fertilizer *containing only 32% ammonium nitrate.*" *Mot.*

at 15 (emphasis in original). Uralchem notes that "[t]he main substance in the formulation of NS

30:7, accounting for 59.1% of the product, is a pair of double salts of ammonium nitrate and

ammonium sulfate," which Uralchem claims have "unique, identifiable crystal and chemical

structures that are distinct from each other and from those of AN." *Id.* at 15-16. Uralchem

contends that, in the form in which NS 30:7 is imported, "***the double salts contain no discrete units of either ammonium nitrate or ammonium sulfate.***" *Id.* at 18 (emphasis in original). As confirmation that the chemical composition of NS 30:7 differs from AN, Uralchem points to lab analyses, published studies, and affidavits from three independent chemistry experts, all of which Uralchem placed on the record of the scope proceeding. *See id.* at 16-18.

Uralchem also points to the Chemical Abstracts Service ("CAS") Registry run by the American Chemical Society, which assigns a distinct numerical code to each chemical substance. *See id.* at 19-20. Uralchem argues that the different CAS Registry numbers assigned to the two double salts in NS 30:7, and to AN, indicate that they are chemically-distinct compounds. *See id.* at 20. Uralchem also points to the nitrogen content of NS 30:7, which is 30%, and argues that "AN has continuously been demonstrated to be a chemical compound containing a *minimum* of 34% of nitrogen." *Id.* (emphasis in original).

Commerce notes that at the second stage of the scope proceeding, in order to determine whether NS 30:7 was an AN product, "Commerce first determined the amount of ammonium nitrate that is present in NS 30:7." *Opp.* at 16 (citing *Final Scope Ruling* at 10). In order to answer this question, Commerce examined "competing record evidence": on the one hand, Uralchem's evidence that NS 30:7's AS/AN double salt structure was chemically-distinct from AN; and, on the other hand, evidence (including an affidavit from an expert employed by Defendant-Intervenors) that the AN present in combined form in the double salts was relevant for purposes of the antidumping duty order. *Id.* at 16-17. In deciding whether to count only the 32% of uncombined AN in NS 30:7, as urged by Uralchem, or to also count the AN present in the double salts in combined form, Commerce looked to the petition. *Id.* The plain language of the petition indicated that "it is the Petitioner's intention to include within the petition all solid

ammonium nitrate for agricultural use," and that Commerce must consider the agricultural

application of any given fertilizer. *Id.* at 17 (citing *Final Scope Ruling* at 10 (internal citation

omitted)).

Analyzing the second step of the scope determination in the context of the petition,

Commerce therefore considered whether the combined AN in the double salts of NS 30:7 was

agriculturally-distinct from AN. *See id.* What Commerce found to be relevant was "whether the

combined AN in the double salts functions as AN." *Id.* (citing *Final Scope Ruling* at 11.)

Because a plant will respond to the AN in the double salts of NS 30:7 in the same manner as it

will respond to pure AN, Commerce concluded that "combined and uncombined ammonium

nitrate function in the same way" and that the amount of AN in both forms "is relevant to the

total ammonium nitrate content" of NS 30:7. *Id.* at 16. Commerce added the 32% of uncombined

AN in NS 30:7 to the 38% of AN in combined form in the double salts to calculate a total AN

content of 70% for NS 30:7 for purposes of the scope determination. *Id.* at 18.

As for the CAS Registry numbers of the double salts in NS 30:7 and AN, Commerce

acknowledges them but found that "it does not follow that [the double salts] themselves contain

no AN or that it is inappropriate to consider their AN content." *Id.* at 20 (citing *Final Scope

Ruling* at 17). Absent any reference to the CAS Registry in the petition or scope language,

Commerce argues that they are not relevant to the scope proceeding. *See id.* Similarly,

Commerce rejects Uralchem's argument that only products with 34% or more of nitrogen can

fall within the scope, pointing out that the scope and other (k)(1) materials contain no minimum

nitrogen requirements. *See id.* In addition, Commerce noted that the nitrogen content of NS 30:7

actually falls within the range of nitrogen content in products Commerce found to be within

scope in other proceedings. *See id.* at 20-21.

2.      The Legal Standard Applied by Commerce

Uralchem claims that "Commerce departed from established law and agency practice by employing what appears to be a new legal test." *Mot.* at 22. The crux of this argument is Uralchem's contention that the new test was "to determine scope coverage based on how the product dissolves in water and that it is the dissolved *ions* which reach the plant that count," contrary to the ordinary principle that "duties attach to merchandise in its condition upon importation into the United States." *Id.* at 22, 23. In Uralchem's view, Commerce violated this principle when, for purposes of the scope determination, it analyzed the amount of AN that NS 30:7 would make available to plants upon use, rather than the amount of AN in NS 30:7 in its imported state. *See id.* Uralchem states that "Commerce cites no authority for its new test" and claims that this "departure from law and practice without a valid explanation" renders the scope determination "arbitrary and capricious." *Id.* at 23-24 (internal citation omitted).

Commerce counters that Uralchem is offering a distorted mischaracterization of its reasoning which "incorrectly claims that Commerce focused on how NS 30:7 dissolves in water rather than its physical state before importation." *Opp.* at 22-23. Commerce claims that it counted the ammonium nitrate in the double salts because "both the petition and the ITC report emphasize the intended use of ammonium nitrate," so "NS 30:7's qualities as a fertilizer are relevant to the question of how much ammonium nitrate NS 30:7 contains." *Id.* at 23 (citing *Final Scope Ruling* at 11). Commerce states that "this analysis does not depend on what happens to NS 30:7 after importation." *Id.* In Commerce's view, Uralchem has misunderstood its analysis, since "in no way does Commerce's determination hinge on some alteration to the physical properties of NS 30:7," but rather relies on physical characteristics of the product that are unchanged by importation. *Id.* Commerce "did not dissolve NS 30:7 into water when

considering the product's ammonium nitrate content" but rather considered whether the AN in

the double salts of NS 30:7 functions as AN and is therefore necessary to consider in determining

whether NS 30:7 is an AN product. *Id.* at 23-24.

3. <u>Rejection of Factual Material Submitted by Uralchem</u>

It is undisputed that Commerce rejected Uralchem's initial brief on the preliminary scope

determination on the grounds that it contained new factual information filed on May 29, 2013,

after the December 21, 2012 deadline for factual submissions. *Mot.* at 25 (citing *Rejection Letter*,

P.R. 50). Uralchem claims that the rejected material (consisting of comments from the electronic

docket of the *Ammonium Nitrate Security* Program rulemaking) was not new factual information

under the definition of factual material given at 19 C.F.R. § 351.102(b)(21) because it was "a

response to Commerce's application of its []new test." *Id.* at 25-26. Uralchem also contends that

the deadline mentioned by Commerce in its letter rejecting the factual material at issue was set

without authority, and that the act of rejecting factual material in a scope inquiry on grounds of

lateness has no basis in statute or Commerce regulations. *Id.* at 26-27. Finally, Uralchem claims

that it filed comments on December 21, 2012 challenging petitioner's December 12, 2012 brief,

and that Commerce accepted new factual information submitted in reply by petitioners on

January 14, 2013. *Id.* at 27. Uralchem points out that Commerce later relied on material from

petitioner's late submission to justify its new test, and argues that doing so while rejecting

Uralchem's post-December 12, 2012 submission was arbitrary and capricious. *Id.* at 28.

Commerce contends that it acted in accordance with law when it rejected Uralchem's

May 30, 2013 submission of new information. *Opp.* at 25. According to Commerce, it is entitled

to set deadlines for the submission of factual information in scope cases (as a type of

antidumping duty proceeding) under 19 C.F.R. § 351.301. *Id.* at 26-27. Commerce also points to

19 C.F.R. § 351.302(d)(1)(i), requiring Commerce to reject "[u]ntimely filed factual

information" as the basis on which it rejected the Uralchem submission as issue. *Id.* at 25.

Commerce suggests that Uralchem is arguing that the § 351.302(d) deadline provision does not

apply to scope rulings, but points out that the deadline provision there applies to "antidumping

and countervailing duty proceedings." *Id.* at 26-27 (quoting 19 C.F.R. § 351.301(a)). A

proceeding, Commerce notes, consists of "one or more segments" pursuant to 19 C.F.R.

§ 351.102(b)(47)(i), and "a scope inquiry . . . would constitute a segment of a proceeding"

according to 19 C.F.R. § 351.102(b)(47)(ii). *Id.* at 24. Thus Commerce interprets the language of

its own regulations to mean that "section 351.301 applies to scope rulings" and that its December

12, 2012 deadline for factual information was legitimate. *Id.*

  Commerce also counters Uralchem's allegation that Commerce treated Uralchem and

petitioners differently by rejecting Uralchem's May 29, 2013 factual submission but accepting

(and relying upon) petitioner's January 14, 2013 factual submission. Commerce notes that on

January 4, 2013, petitioners timely requested an extension of a deadline for factual submissions,

which Commerce granted with an extension until January 14, 2013. *Id.* at 28-29. Uralchem did

not challenge petitioner's stated reasons for the extension at that time. *Id.* at 29. Commerce

points out the context: Uralchem submitted factual materials on December 21, 2012, and

petitioners' January 14, 2013 letter was submitted pursuant to the extension of time and 19

C.F.R. § 351.301(c) to "rebut, clarify or correct" those materials. *Id.* Commerce argues that it

was entitled to treat the petitioner's submission of rebuttal and clarification material, submitted

pursuant to regulation and within an extended deadline, differently from Uralchem's May 29,

2013 submission, which contained no rebuttal or clarification material and was not submitted

within the deadline (extended or otherwise). *Id.* at 29-30.

4.      Whether the *Final Scope Ruling* Is Arbitrary and Capricious

Uralchem argues that Commerce's *Final Scope Ruling* is arbitrary and capricious, and

therefore not in accordance with law, because (a) Commerce failed to explain why a new test

was being applied; (b) Commerce treated Uralchem and petitioners differently with respect to the

acceptance of filings made after the December 12, 2012 cutoff date for submitting factual

information; and (c) Commerce ignored scientific and expert evidence that NS 30:7 is ASN, not

AN. *Id.* at 29-30.

**B.      Commerce's *Final Scope Ruling* Was Supported by Substantial Evidence and
      Otherwise According to Law**

For the reasons that follow, the Court finds that Commerce had the support of substantial

evidence in reaching its scope determination, that Commerce reasonably considered all of the

relevant evidence including that which conflicted, that Commerce did not incorrectly apply the

governing legal standards, that Commerce acted properly in rejecting certain late-submitted

factual material, and that Commerce did not reach its conclusions in an arbitrary and capricious

manner. Therefore the Court will affirm Commerce's *Final Scope Ruling*.

1.      Commerce Reasonably Determined the AN Content of NS 30:7

The Court holds that Commerce made a reasonable choice based on substantial evidence

in the record when it decided to count the combined AN in NS 30:7 toward the product's total

AN content and thereby concluded that NS 30:7 consisted of 70% AN for scope purposes.

In the appeal of a scope determination, the Court does not replace Commerce as the

factfinder but instead reviews Commerce's factfinding decisions to ensure that they are

reasonable and supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *see also*

*Granges Metallverken AB v. United States*, 13 CIT 471, 474, 716 F. Supp. 17, 21 (1989).

Commerce was faced in this case with a record in which it was uncontested that NS 30:7 was comprised of 32% uncombined AN and 59.1% of a pair of double salts of ammonium nitrate and ammonium sulfate. In examining the evidence to determine how to treat these double salts that were admittedly composed in part of AN, Commerce reviewed Uralchem's evidence which indicated that the double salts had crystalline structures distinct from AN, unique CAS Registry numbers, and a different nitrogen content from AN. Commerce also reviewed Defendant-Intervenors' evidence, indicating that despite differences in chemical structure, the AN held in a combined form inside the double salts of NS 30:7 gave it the agricultural function of an AN fertilizer. Commerce chose to rely on the Defendant-Intervenors' expert and consequently chose to count the AN in combined form inside the double salts toward the total AN content of NS 30:7. Uralchem's argument can be summarized as saying that Commerce should have confined itself to examining the chemical packaging inside NS 30:7 (i.e. the double salts) and ignored the AN content of that chemical packaging.

In challenging this decision, Uralchem disputes how Commerce resolved factfinding issues and, in essence, requests that the Court substitute its own factfinding judgment for that of the agency. This the Court cannot do under the standard of review. There is evidence on the record to support the choice made by Commerce, and evidence to the contrary does not demonstrate that no reasonable decision-maker could decide as Commerce did.

2.    Commerce Did Not Apply a "New Test"

The Court finds that Commerce correctly examined NS 30:7 in light of the (k)(1) sources (scope language, petition, and prior ITC and Commerce decisions) in order to determine whether it was an ammonium nitrate product, and did not impose a "new test" to do so. Uralchem accuses Commerce of having ignored the requirement that it examine NS 30:7 as imported when

determining whether it falls inside the scope of the *ADD Order* and instead considering NS 30:7 in its condition after application to crops and dissolution by water. This is not a fair characterization of Commerce's scope determination analysis.

Commerce was obligated to take into consideration the "descriptions of the merchandise contained in the petition, the initial investigation, and [prior] determinations." 19 C.F.R. § 351.225(k)(1). Commerce noted that the petition and ITC report described the use to which the subject merchandise would be put, and thus Commerce considered the use or function of NS 30:7 when considering whether it was covered merchandise. Doing so did not constitute a new test, which would comprise a new manner of analyzing evidence for its relevance. Instead, Commerce analyzed the evidence regarding NS 30:7 for its relevance in terms dictated by the regulation (i.e. with reference to the (k)(1) sources). Commerce did not ignore the physical state of NS 30:7 at the time of import, or hinge the scope decision on the condition that NS 30:7 would one day have if used as fertilizer. Commerce instead examined the physical state of NS 30:7 at import and, informed by the (k)(1) materials that spoke of the importance of the agricultural use of an imported fertilizer, determined that the AN contained in NS 30:7's double salts was relevant to calculating its total AN content since it was an agriculturally-functional component of NS 30:7.

To the extent that Uralchem seeks to make a legal argument here that would call for a different interpretation of how the (k)(1) sources should be integrated into a scope analysis, the Court rejects Uralchem's contention. Commerce is entitled to deference in interpreting its own regulations, and the Court finds nothing unreasonable or erroneous about the manner in which Commerce applied 19 C.F.R. § 351.225(k) here.

3.    Commerce Properly Rejected Late Factual Information from Uralchem

Commerce is entitled to set deadlines for the submission of factual information in antidumping duty proceedings. *See* 19 C.F.R. § 351.301; *see also SKF USA Inc. v. United States*, 33 CIT 1866, 1876, 675 F. Supp. 2d 1264, 1274 (2009) ("Commerce has broad authority to set, and extend, its deadlines for submission of requested information."), *Maui Pineapple Co., Ltd. v. United States*, 27 CIT 580, 595, 264 F. Supp. 2d 1244, 1257 (2003) ("Commerce [] has broad discretion to fashion its own rules of administrative procedure, including the authority to establish and enforce time limits concerning the submission of written information and data.") (internal citation omitted). In the context of questionnaire responses in an antidumping duty investigation, the Court has stated that "Commerce necessarily must exercise discretion in setting, extending, and enforcing deadlines for the submission of requested information." *Artisan Mfg. Corp. v. United States*, 38 CIT ___, ___, 978 F. Supp. 2d 1334, 1342 (2014) (reviewing Commerce's decision to sanction missed deadlines under an abuse of discretion standard).

Uralchem advances a theory about the proper interpretation of Commerce's regulations, taking the view that the regulations regarding deadlines, 19 C.F.R. § 351.301 and 19 C.F.R. § 351.302(d)(1)(i), do not apply to scope determinations. Commerce regulations do not provide a model of clarity regarding the deadlines applicable to scope proceedings. Many of the familiar types of antidumping duty proceedings are referenced in ways practitioners can easily understand in the deadline regulation at 19 C.F.R. § 351.301 (e.g. final determinations of investigations at (b)(1), final results of administrative reviews at (b)(2), final results of changed circumstances and sunset reviews at (b)(3), final results of new shipper reviews at (b)(4), and final results of expedited antidumping reviews at (b)(5)), but scope determinations are not specifically

mentioned. The helpful charts of deadlines provided at Annexes I-IV to Part 351 of the

Commerce regulations also do not mention scope proceedings by name.

Commerce is entitled to deference regarding the interpretation of its own regulations

unless that interpretation is plainly erroneous or inconsistent with the plain language of the

regulation. *See Torrington*, 156 F.3d at 1363-64 (citations omitted); *see also Mid Continent Nail

Corp. v. United States*, 38 CIT ___, ___, 999 F. Supp. 2d 1307, 1327 (2014) (stating that the

Court will defer to Commerce's interpretation of its own regulation where the interpretation is

"reasonable"). The regulations in 19 C.F.R. § 351.301 do not explicitly refer to scope reviews,

but Commerce points out that its time limits apply to the submission of factual information "in

antidumping and countervailing duty proceedings," which consist of one or more segments, and

the regulations specify that a scope inquiry constitutes a segment of a proceeding. 19 C.F.R.

§ 351.102(b)(47)(i)-(ii). There can be no doubt that a scope proceeding is a segment of an

antidumping proceeding. *Opp.* at 26-27 (quoting 19 C.F.R. § 351.301(a)). The regulations

specify that Commerce may "request any person to submit factual information at any time during

a proceeding." 19 C.F.R. § 351.301(c)(2). And, as argued by Commerce, 19 C.F.R.

§ 351.302(d)(i) mandates that Commerce reject "[u]ntimely filed factual information." The

Department reasonably interprets the language of these regulations as authorizing the setting of

deadlines and rejection of factual information submitted outside the deadlines in scope

proceedings. The Court therefore must and will defer to Commerce's reasonable construction of

its own regulations. Additionally, the scope ruling regulation contemplates that Commerce will

issue "[a] schedule" and explains when submissions will "normally" be due. 19 C.F.R.

§ 351.225(f)(iii) ("A schedule for submission of comments [] normally will allow interested

parties 20 days in which to provide comments on, and supporting factual information relating to,

the inquiry, and 10 days in which to provide any rebuttal to such comments"); *see also*

§ 351.225(f)(iii)(3) (Commerce "will notify all parties . . . of the preliminary scope ruling, and

will invite comment" which will be due in 20 days unless otherwise specified). Unless

Commerce can enforce a schedule, there would be little point in Commerce being authorized to

issue one.

The enforcement of scope ruling deadlines is an exercise of Commerce's discretion, and

should therefore be examined to ensure against abuse of discretion. *See Artisan*, 978 F. Supp. 2d

at 1345-49. The Court cannot say that Commerce abused its discretion in rejecting Uralchem's

late submitted factual information. Unlike in *Artisan*, where the party's submission was late by

less than a single business day, 978 F. Supp. 2d at 1347, Uralchem's May 29, 2013 submission

was late by more than five months. To this late submission, Commerce attached only the most

logical consequence: rejection of the late material. This rejection did not have a single, obvious

negative impact on the scope decision. This contrasts with *Artisan*, where Commerce used a very

brief filing delay to impose a duty rate at the non-market economy all-others rate, based on an

adverse inference, and resulting in an approximate doubling of antidumping duties. *Id*. In

addition, here Commerce was exercising its authority under 19 C.F.R. § 351.225, and deserves

latitude because that regulation provides Commerce flexibility with its deadlines in scope

proceedings (using terms such as "normally" and "unless otherwise specified" in relation to the

deadlines). Commerce also rejected Uralchem's late factual information in compliance with 19

C.F.R. § 351.302(d). While there can be exceptions to enforcement of that rule, the parties do not

argue them here and in any case such exceptions are inapplicable.

The Court also rejects Uralchem's argument that Commerce treated it arbitrarily and

capriciously by rejecting its late filed factual information while accepting allegedly late

submitted factual information from petitioners. As Commerce makes clear, petitioners requested

and received an extension of time for submission of the documents in question (rebuttal

comments from petitioners), and thereafter filed the submission within their extended deadline.

*See Opp.* at 28-29. Additionally, petitioners' materials consisted of *rebuttal* material, *not* new

factual information, which was a crucial difference because rebuttal material is subject to the

deadlines of 19 C.F.R. § 351.301(c). It appears that Commerce applied that regulation to

petitioners' filing, but did not apply it to Uralchem's later filing of new factual information.

(Even if Uralchem's submission were interpreted to be rebuttal commentary, it fell far outside

the 19 C.F.R. § 351.301(c) timeframe and was not permitted by an extension of time.) The Court

finds that Commerce has articulated a reason for treating the two submissions differently that is

reasonable, and the Court therefore holds that the rejection of Uralchem's May 29, 2013 filing

was not arbitrary and capricious.

For these reasons, the Court defers to Commerce's interpretation of its regulations

regarding deadlines in scope rulings and upholds Commerce's rejection of Uralchem's late filed

factual information.

### 4.       The *Final Scope Ruling* Was Not Arbitrary and Capricious

Uralchem's argument that the *Final Scope Ruling* was arbitrary and capricious rests

largely on grounds that the Court has already considered and rejected. Uralchem claims that

Commerce acted arbitrarily and capriciously in failing to announce its "new test," but the Court

finds Commerce did not employ a new test at all. And Uralchem claims Commerce acted

arbitrarily and capriciously by treating Uralchem and petitioners differently regarding late

filings, but the Court finds that Commerce correctly applied its regulations in doing so and had a

reasonable basis for distinguishing the two submissions. Finally, Uralchem claims it was

arbitrary and capricious for Commerce to ignore scientific and expert evidence that NS 30:7 is

ASN, not AN. However, Commerce responded at length to Uralchem's evidence regarding the

chemical and crystalline structure of NS 30:7's double salts, and rejected the notion that these

double salts were more like ASN than AN. *Opp.* at 19 (citing *Final Scope Ruling* at 19-20). The

Court has already found that Commerce gave adequate consideration to Uralchem's scientific

and expert submissions and reached a decision supported by the record evidence. For these

reasons, Uralchem's contention that the *Final Scope Ruling* was arbitrary and capricious is

rejected.

### CONCLUSION

As discussed above, the Court finds that Commerce's *Final Scope Ruling* was supported

by substantial evidence and otherwise in accordance with law. Therefore, Plaintiff's motion is

denied.

The Court will separately issue judgement upholding the *Final Scope Ruling*.


                                                    /s/Gregory W. Carman
                                                  Gregory W. Carman, Senior Judge

Dated:  March 26, 2015
        New York, NY